Joanna **PETRY**, et al., Appellants,

v.

John **BLOCK**, Secretary of
Agriculture, et al.

No. 83–1612.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 8, 1984.

Decided June 29, 1984.

Kathleen A. McKee, Alexandria, Va., for appellants.

Freddi Lipstein, Atty., Dept. of Justice, Washington, D.C., with whom J. Paul McGrath, Asst. Atty. Gen., Stanley S. Harris, U.S. Atty., Washington, D.C. (at the time the brief was filed), and Robert E. Kopp, Atty. Dept. of Justice, Washington, D.C., were on the brief, for appellees.

Leonard Schaitman and Nicholas S. Zeppos, Attys., Dept. of Justice, Washington, D.C., also entered appearances, for appellees.

Paula Roberts and Barbara Milstein, Washington, D.C., were on the brief of amicus curiae urging reversal.

Before WALD, BORK and STARR, Circuit Judges.

Opinion for the Court filed by Circuit Judge STARR.

STARR, Circuit Judge:

This case presents procedural and substantive challenges to a rule implementing reductions in federal spending which were mandated by Congress in the summer of 1981. Appellants are participants in the Child Care Food Program, a federal financial assistance program administered by the United States Department of Agriculture. They brought this action in June 1982, challenging a regulation [1] adopted by the Secretary of Agriculture to implement certain provisions of the watershed Omnibus Budget Reconciliation Act of 1981 ("OBRA").[2]

At the outset of this litigation, plaintiffs moved for a preliminary injunction to set aside the new regulation, on the theory that the Department had misinterpreted the relevant provisions of OBRA. Instead

---

1. 7 C.F.R. § 226.12(a)(3) (1984). The rulemaking at issue in this case also amended 7 C.F.R. § 226.16(d)(4)(ii); this regulation, however, is not challenged by appellants.

2. Pub.L. 97–35, 95 Stat. 357 (Aug. 13, 1981).

of mandating a reduction in certain Child Care Food Program expenditures, the statute, plaintiffs argued, required only a reduction in the maximum allowable rates payable.[3] The District Court agreed and granted the preliminary injunction on June 28, 1982. By order dated August 31, 1982, this court stayed the preliminary injunction pending appeal.

In *Petry v. Block*, 697 F.2d 1169 (D.C. Cir.1983), this court reversed the District Court's decision and remanded the case. Our decision "upheld the Secretary [of Agriculture's] interpretation of [OBRA's] amendment" of the Child Care Food Program ("CCFP") statute, but noted that "issues remain for resolution by the District Court relating to the manner in which the challenged regulation was promulgated and its reasonableness in the light of facts presented." *Id.* at 1171. On remand, appellants argued that the Department's adoption of this regulation ran afoul of both OBRA and Administrative Procedure Act ("APA")[4] requirements. They moved for summary judgment, requesting that the new regulation be invalidated and the entire matter remanded to the Department for promulgation of a new regulation.

In a Memorandum Opinion and Order dated March 29, 1983, the District Court denied appellants' motion, and granted summary judgment in favor of the appellees. Appellants now seek review of that decision. We affirm.

## I

The Child Care Food Program provides financial assistance to the several States to defray the cost of meals served to needy children in child care centers and day care facilities. CCFP also reimburses a portion of administrative expenses incurred by sponsoring organizations, which supervise day-care homes and assist in the administration of the program.[5]

OBRA, a widely publicized measure passed in 1981, was aimed at reducing the level of federal expenditures. The measure was designed, in relevant part, to make numerous changes in the funding of federal welfare programs, including the program here in question. To this end, OBRA amended the CCFP statute to require a ten percent reduction in amounts paid by the Secretary of Agriculture as reimbursement for sponsoring organizations' administrative expenses.[6] As the case comes to us, no curtailments other than for administrative expenses are at issue.

In the spirit of the day, OBRA placed administrative agencies on an unusually fast track to implement the mandated changes. Accordingly, the measure provided for, among other things, expedited implementation of the reduction in CCFP administrative reimbursements. Specifically, section 820(c) of OBRA directed the Secretary to promulgate implementing regulations "[n]ot later than 60 days after the date of enactment" of OBRA.[7] Because OBRA was signed into law on August 13, 1981, the statute had the effect of requir-

---

**3.** Both the pre- and post-OBRA versions of 7 C.F.R. § 226.12(a)(3) are explained in note 9, *infra*. Appellants' theory at the time of their motion for a preliminary injunction was that OBRA required only that the rates themselves be reduced by an average of ten percent. *Petry v. Block*, 697 F.2d 1169, 1170 (D.C.Cir.1983). The post-OBRA version of this regulation, however, reduced the maximum rates anywhere from twenty to thirty-seven percent, *id.* at 1171, in order to effect a ten-percent reduction in "administrative reimbursements actually provided." *Id.* at 1170.

**4.** 5 U.S.C. § 551 *et seq.* (1982).

**5.** 42 U.S.C. § 1766 (Supp. V 1981). Appellants comprise members of all three groups which benefit from CCFP: minor children (represent-

ed by their parents), participating child care centers and day care homes, and sponsoring organizations. Appellants' Brief at 8.

**6.** The amendment reducing reimbursements is set out in section 810(d)(3)(B) of OBRA (codified at 42 U.S.C. § 1766(f)(3)(B) (Supp. V 1981)). This section directed the Department to include in the new rule an "increase in the economy of scale factors used to distinguish institutions that sponsor a greater number of family or group day care homes from those that sponsor a lesser number of such homes."

**7.** Reprinted as a note 42 U.S.C. § 1753 (Supp. V 1981).

ing the Secretary to promulgate new reimbursement regulations on or before October 12, 1981. OBRA further provided that the new reimbursement system was to take effect on January 1, 1982. *See* section 820(a)(6) of OBRA, 42 U.S.C. § 1753 note (Supp. V 1981). The stage was thus set for the events that led to this litigation.

The responsibility for developing new reimbursement regulations fell upon the shoulders of the Department's Food and Nutrition Service ("FNS"), which is charged with administering CCFP and other federally funded child nutrition programs. Espying OBRA's likely passage on the horizon, FNS collected data during the summer of 1981 with respect to reimbursement practices, but determined that nothing beyond preliminary steps could be taken prior to OBRA's actual passage. Declaration of George Braley, Deputy Administrator for Special Nutrition Programs, FNS, ¶¶ 5–6 ("Braley Declaration").[8]

The timing of FNS' labors on the new regulation is not disputed by the parties, although the appellants argue vigorously that the Secretary, through FNS, failed to work with sufficient diligence and dispatch in this task. FNS completed the first draft of the regulation in good measure on September 17, 1981. Braley Declaration ¶ 10. After this auspicious beginning, the proposed rule entered FNS' internal clearance procedure on October 2, 1981. Defendants' Response to Plaintiffs' Interrogatories and Request for Production of Documents, *re-printed in* Appendix ("App."), at 36a. The review of the draft regulation continued in early October, at which point storm clouds of delay loomed large. "[I]t appeared unlikely to FNS that clearance and publication of the proposed rule, allowance for a sixty-day comment period, analysis of comments, and publication of a final rule would be possible by January 1, 1982 ...." Braley Declaration ¶ 10. As a result, FNS withdrew the regulation from the clearance process and redrafted it as an interim rule. The proposed interim rule was placed in the clearance process on October 22, 1981.

These well-laid plans then went awry. In November 1981, an error was discovered in the reimbursement formula set forth in the proposed interim rule which would have resulted in an overreduction of reimbursements. The clearance procedure was again aborted, and the draft regulation reworked to eliminate the error contained in the formula. As the calendar fatefully moved toward New Year's Day, a new draft was completed on December 8, 1981, and promptly placed into FNS' internal clearance procedures.

Clearance proved to be a six-week process. After subsequently gaining agency and OMB clearance, the regulation was finally published on January 26, 1982 as an interim rule. 47 Fed.Reg. 3539–41 (1982).[9] The new rule was, however, made effective retroactively as of January 1, 1982, which will be recalled was the effective date man-

---

8. While the District Court did not make express factual findings in all these respects, appellants did not controvert below in any fashion the facts as set forth here. Indeed, the District Court docket sheet indicates that plaintiffs-appellants never filed a Statement of Genuine Issues, pursuant to Local Rule 1–9(i), in order to contest the defendants-appellees' Statement of Material Facts as to Which There Is No Genuine Issue.

9. The new rule was designed to reduce Department payments to sponsoring organizations by approximately $1.8 million. 47 Fed.Reg. at 3539. To effect this reduction, the new rule changed the classification system used to group sponsoring organizations by size for reimbursement purposes. The then-existing three-tier system provided the following maximum allowable reimbursement levels:

| Number of homes sponsored | Reimbursement per home per year |
| --- | --- |
| First 25 homes | $53 |
| 26–75 homes | 41 |
| Each home over 75 | 35 |

The new rule provided for a four-tier system, designed to reflect previously unaccounted for economics of scale realized by large sponsoring organizations. *Id.* 7 C.F.R. § 226.12(a)(3) now allows reimbursement at the following levels:

| Number of homes sponsored | Reimbursement per home per year |
| --- | --- |
| First 50 homes | $42 |
| 51–200 homes | 32 |
| 201–1000 homes | 25 |
| Each home over 1000 | 22 |

dated by OBRA.[10] The notice of the interim rule also announced a sixty-day comment period. During this ensuing period, the Department received 125 comments. After reviewing the comments, the Secretary determined that no change was warranted in the rule before its adoption in final form. On June 25, 1982, the final rule, identical to the interim rule announced in the preceding January, was published. 47 Fed.Reg. 27,540–44 (1982).

## II

In light of this procedural history, appellants mount an attack against the new reimbursement regulation on three grounds. First, they argue that the initial issuance of the regulation in January 1982 as an interim rule—with retroactive effect—violated the requirement of section 553(b) of the APA that prior notice be given of a proposed rulemaking and public comment procedures followed. As a second prong of this initial ground of attack, appellants strenuously argue that the circumstances presented here do not justify invocation of the section 553(b)(B) "good cause" exemption from the section 553(b) requirement.[11]

Appellants claim, secondly, that appellees breached their APA obligation to disclose a summary of the information and data relied upon in drafting the regulation sufficient to enable interested parties to submit "meaningful" comments on the interim regulation. Third and finally, appellants charge that the Department's decision to adopt the final rule was arbitrary and capricious, in that the Department failed to consider all relevant evidence in reaching its decision.

We first address the latter two objections, which go to the final rule now in effect, and then consider the "good cause" question, which goes only to the promulgation in 1982 of the now superceded interim rule.

### A

■ Appellants claim that the Secretary failed to describe adequately the "information and data relied upon in drafting" the interim rule, Appellants' Brief at 28, and that this asserted error fatally infects the rule as adopted. We disagree.[12]

In support of their argument, appellants rather unfairly characterize the information set forth in the January 26, 1982 notice of the interim rule. This notice cited the Department's "review of available data" and information generated by a nationwide study of the Program conducted for the Department by ABT Associates, a private consulting firm, as support for (1) the Department's view of economies of scale in the sponsoring organizations, (2) the Department's estimate of actual payments made under the old regulations, and (3) the adjustments necessary to bring payout rates down to OBRA-mandated levels. It is undisputed that the Secretary made available to requesting parties the ABT study's raw data and the Department's own study. Braley Declaration ¶ 14. The Department, moreover, did not rely upon

---

**10.** Monthly claims for reimbursement must be submitted not later than ten days after the end of the month. 7 C.F.R. § 226.10(c). By getting the interim rule on the books before the end of January 1982, the Secretary insured that the reimbursements made for that month would be subject to the OBRA-mandated ten percent cutback, thus complying with the January 1, 1982 effective date of the controlling provision of OBRA.

**11.** Another "good cause" exception, contained in section 553(d)(3), may be applicable in certain cases where the requirements of section 553(d) are not met. *American Fed'n of Gov't Employees v. Block,* 655 F.2d 1153, 1155–56 (D.C.Cir. 1981). This exception was not invoked by the Department in this case, and we therefore do not discuss it.

**12.** We observe at the outset that the District Court fell into error in its analysis of this issue and the good cause issue by considering the fact that in 1971 the Department voluntarily placed under APA coverage its rulemaking proceedings concerning "public property, loans, grants, benefits, or contracts," which would otherwise be exempt from APA requirements pursuant to 5 U.S.C. § 553(a)(2). *See* 36 Fed.Reg. 13,804 (1971). Under *Rodway v. Department of Agriculture,* 514 F.2d 809, 814 (D.C.Cir.1975), the fact that an agency chose to operate under the APA is irrelevant to an analysis of that agency's compliance with its provisions.

materials not made available to interested parties. *Id.*

Appellants nonetheless argue that the Department's actions were insufficient to ensure informed responses to the interim rule. They apparently are of the view that a much more extensive explanation of the two studies described in the January 26, 1982 notice was required by two prior appellate decisions, namely *Portland Cement Ass'n v. Ruckelshaus,* 486 F.2d 375 (D.C. Cir.1973), *cert. denied,* 417 U.S. 921, 94 S.Ct. 2628, 41 L.Ed.2d 226 (1974), and *United States v. Nova Scotia Food Products Corp.,* 568 F.2d 240 (2d Cir.1977). This argument, to put it gently, misinterprets these decisions. In *Portland Cement,* the "critical defect" was the "inability of petitioners to obtain—in timely fashion—the test results and procedures used on existing [cement] plants which formed a partial basis for the emission control level adopted." 486 F.2d at 392. Similarly, in *Nova Scotia,* "all the scientific research was collected by the agency, and none of it was disclosed to interested parties as the material upon which the proposed rule would be fashioned." 568 F.2d at 251. The situations presented by those two cases, involving nondisclosure of information or data relied upon by the agency, are a far cry from the case at hand. Here, the agency in its announcement of the rule adequately described the information on which it relied, *see* 47 Fed.Reg. at 3539–40, and later made that information available upon request. Inapposite as they so manifestly are, *Portland Cement* and *Nova Scotia* simply cannot be twisted so as to require notices of proposed or interim rules to contain elaborate reproduction of underlying studies.

### B

Appellants also argue that the Department's adoption of the final CCFP reimbursement rule in the summer of 1982 violated the bedrock requirement of APA section 706(2)(A) that agency action not be "arbitrary" or "capricious." The charge in this respect appears to be that the Secretary failed adequately to consider certain information contained in the comments submitted by opponents of the new regulation. The result of this inattention, appellants claim, is that the Department continued to rely upon allegedly flawed data which formed the basis for the interim rule, thereby rendering the final rule arbitrary and capricious.

■■■ Under this well-worn standard of review, it is settled that this court "is not to substitute its judgment for that of the agency." *Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Insurance Co.,* 463 U.S. 29, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983). Rather, the court is to conduct a " 'searching and careful' inquiry, the keystone of which is to ensure that the [agency] engaged in reasoned decisionmaking." *International Ladies' Garment Workers' Union v. Donovan,* 722 F.2d 795, 815 (D.C.Cir.1983) (citations omitted). It is the responsibility of "[t]he agency itself [to] supply the evidence of that reasoned decisionmaking in the statement of basis and purpose" required by section 553(c) of the APA to be published with the final rule. *International Brotherhood of Teamsters v. United States,* 735 F.2d 1525, 1531 (D.C.Cir.1984). Agency action will normally be found arbitrary and capricious only

> if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Manufacturers, supra,* 103 S.Ct. at 2867.

■■■ It is clear that, measured against this standard, the Department's final rule can by no means be deemed arbitrary or capricious. A review of the Department's June 25, 1982 notice to the final rule belies the claim that the Department "summarily dismiss[ed]" the criticisms contained in the comments as "baseless." Appellants Reply

Br. at 14. Quite to the contrary, the Department squarely addressed the criticisms leveled at the data relied upon at the interim rule stage, and also set forth responsive views with respect to other points raised by the comments.

The position advanced by appellants, and other commenting parties who opposed the new rule, seems to reduce to the idea that the rule was defective because the levels of administrative costs and actual federal reimbursements of those costs varied from State to State, and that this variation was not satisfactorily captured in the rulemaking. The result of this defect, appellants claim, is that the final rule "achieve[s] cost savings in excess of the 10% authorized by statute." Plaintiffs' Response in Opposition to Defendants' Motion for Summary Judgment at 12.

In answer to this challenge, the Department defended its reliance upon two data sources: the ABT Associates statistical study of day care centers mandated by Congress, and reimbursement records from sponsoring organizations operating in the fourteen States where CCFP is administered by the Department.[13] The Department explained that the process employed to select the States and sponsors included in the statistical model "conformed to accepted statistical practices." 47 Fed.Reg. at 27,542. Therefore, the Department concluded that "while conditions for certain sponsors in certain States may not be identical to those observed in the study, the sample is valid for the Program as a whole." *Id.* Similarly, the Department defended the representativeness of the data base developed from information provided by sponsoring organizations in the fourteen-State sample:

The total number of sponsors was 196, or a little less than one-third of all sponsors in the Program. These sponsors operat-

ed over 15,000 homes, also about one-third of all homes nationwide. The size of the source, therefore, offers a high degree of likelihood that the results would be applicable throughout the Program. Moreover, there is no reason to believe that conditions in [these States' programs] differ substantially from those in State agency programs.

*Id.* On the basis of this showing, we agree with the District Court's conclusion that while appellants have "demonstrate[d] *individual* examples in which" the new regulation would decrease reimbursements by more than 10%, they have "fail[ed] to provide evidence countering the Department's conclusions regarding the program" as a whole. Memorandum Opinion at 11 (emphasis added).

The Department also considered, discussed, and rejected various proposals set forth in the comments with respect to the mathematical formula used in computation of the new reimbursement rates. *Id.* at 27,542–43. This discussion seems eminently reasonable, evincing a particular concern for the impact of the new rule on smaller sponsoring organizations.

In the course of this discussion, the Department explained that the new rates "cannot be tailored to conditions in a particular State," given that the revised rates "must ensure that expenditures are reduced nationally in compliance with the law." *Id.* This point seems entirely well-taken. Appellants' contentions in this respect sound rather like an argument that reimbursement rates should not be reduced through any device or formula. While appellants' feelings in this respect are perfectly understandable, they are rendered quite beside the point by the express provisions of OBRA. In sum, the actions by the Secretary here do not remotely approach the level of arbitrariness and caprice.[14]

---

**13.** In the remaining States, CCFP is administered by state agencies which receive federal aid from the Department.

**14.** Indeed, the reasonableness of the new reimbursement regime is strongly supported by undisputed record evidence as to the impact of the

new regulation. In twelve States where the Department directly administers CCFP, administrative reimbursements "made in the first quarter of 1982 and in the first three quarters of 1982 were reduced 10.1% and 8.72% respectively from the last quarter of 1981." Braley Declaration ¶ 15. An FNS canvass of a number of

## C

Having determined that appellants' other APA-based claims are without merit, we turn to the question whether the Secretary erred in promulgating the interim rule. That question squarely presents the issue whether the notice-and-comment procedures mandated by the APA were properly bypassed under the circumstances presented here.

Section 553(b) of the APA provides that "[g]eneral notice of proposed rulemaking shall be published in the Federal Register ...." However, this requirement is not applicable

> when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest.

5 U.S.C. § 553(b)(B).

The Department's January 26, 1982 adoption of the interim rule obviously failed to meet the notice-and-comment requirement of section 553(b). Mindful of this failure, the Secretary invoked the statutorily provided "good cause" exception, observing that "[s]ince the effective date of this [regulation] is January 1, 1982, it is impracticable for there to be prior notice and public comment thereon." 47 Fed.Reg. at 3540. The question before us is whether the Department's recourse to this statutory exception was permissible.

### 1

The requirements of section 553 have been elucidated by a growing body of case law. As an elementary principle, it is clear that exceptions to section 553 notice-and-comment procedures are to be "narrowly construed and only reluctantly countenanced." *American Fed'n of Gov't Employees v. Block*, 655 F.2d 1153, 1156 (D.C. Cir.1981) ("*AFGE*") (quoting *State of New Jersey Department of Environmental Protection v. EPA*, 626 F.2d 1038, 1045

(D.C.Cir.1980)). In *AFGE*, this court stated:

> As the legislative history of the APA makes clear ... the exceptions at issue here are *not* "escape clauses" that may be arbitrarily utilized at the agency's whim. Rather, use of these exceptions by administrative agencies should be limited to emergency situations; furthermore, the grounds justifying the agency's use of the exception should be incorporated within the published rule.

655 F.2d at 1156 (emphasis in original) (citations omitted).

On reviewing the totality of the circumstances presented by this case, we conclude that the Department justifiably invoked the "good cause" exception of section 553(b)(B). For here the combination of several extraordinary factors validates the Department's adoption of the interim rule under the mantle of "good cause."

First, we return to the obvious and overriding factor that OBRA was itself a highly extraordinary piece of legislation, imposing taxing demands on much of the federal bureaucracy. As the Third Circuit has stated, "OBRA was the product of a major, highly publicized, and vigorously debated effort by Congress and the President to reverse the growth of federal spending by systematically reducing the level of expenditures in a wide range of federal programs." *Philadelphia Citizens in Action v. Schweiker*, 669 F.2d 877, 878 (3d Cir. 1982). Further, both Congress and the President articulated a profound sense of "urgency" in the need for implementation of the legislation. *Id.* at 884.

OBRA imposed a complex web of administrative duties, establishing different effective dates for different provisions. But the Act as a whole clearly envisioned very speedy adoption of the mandated changes. To bring this broad point home to the facts before us, numerous OBRA-mandated modifications in programs administered by FNS presented that office with regulation-draft-

---

State-administered programs revealed that reimbursements for the first quarter of 1982 were 5% lower than for the fourth quarter of 1981.

*Id.* at ¶ 16. Such reductions represent substantial progress toward the reductions mandated by OBRA.

ing responsibilities quite in addition to the fast track implementation of new reimbursement rules for CCFP. Some of these other modifications—including modifications in the Summer Food Service Program and other changes to the CCFP—had effective dates of October 1, 1981, rather than the January 1, 1982 effective date of the CCFP administrative reimbursement amendments. The regulations necessary to implement such statutory changes in corporating earlier effective dates therefore had, as a practical matter, to be given priority in FNS' workload over the CCFP reimbursement regulations if the Department was to comply with other congressionally imposed requirements.

In our view, the extremely limited time given by Congress to the Secretary for adoption of the reimbursement regulations is a crucial factor in establishing "good cause." Contrary to appellants' sweeping assertion that "[t]he record in this case ... is replete with unexplained delays," Appellants' Brief at 20, appellees have persuasively demonstrated that Departmental personnel worked diligently in researching, drafting, and processing the challenged rule. During the period from OBRA's passage to September 17, 1981, when the first draft of the regulation was completed, FNS had to process information contained in two data bases detailing reimbursement statistics for CCFP on a program-wide basis: data from fourteen States where FNS directly administers CCFP, and data from a nationwide sample of States and sponsors conducted by ABT Associates. In particular, it was necessary for FNS "to double check projections and calculations, which increased the time required to obtain the necessary information to formulate a reimbursement schedule." Braley Declaration ¶ 9. Also during this period, FNS staff

conducted several meetings "with representatives of sponsoring organizations to discuss ideas about changes in CCFP administrative reimbursement regulations ...." *Id.* at ¶ 7.

By the time the first draft regulation entered the Department's review process in October 1981, less than 90 days remained before the January 1, 1982 implementation deadline. At the time the Department was considering the possibility of redrafting the regulation as an interim rule, only 75 days remained to complete the process. The Department concluded that under this truncated timeframe it would be "impracticable," 47 Fed.Reg. at 3540, to complete the standard notice-and-comment process in time to meet the January 1 deadline. The decision was thus born, as we have seen, to issue an interim rule.

This decision was entirely reasonable, given the requisite time to conduct a notice-and-comment proceeding. The APA, to be sure, does not specify a minimum time for submission of comments in an informal rulemaking. The Administrative Conference of the United States has opined, for the guidance of administrative agencies, that the shortest period in which parties can meaningfully review a proposed rule and file informed responses is thirty days.[15] However, there is scarcely anything talismanic about that particular length of time. Indeed, a thirty-day period is, in the Administrative Conference's view, "an inadequate time to allow people to respond to proposals that are complex or based on scientific or technical data."[16] The Administrative Conference itself thus suggests a sixty-day period as "a more reasonable *minimum* time for coment."[17] And that is precisely the period subsequently provided by the Secretary for comments on the interim rule.[18]

---

15. Administrative Conference of the United States, A GUIDE TO FEDERAL AGENCY RULEMAKING 124 (1983).

16. *Id.*

17. *Id.* (emphasis in original).

18. We obviously are not presented with, and thus express no view whatever on, the question as to what period of time may be appropriate for a comment period under the APA. We simply note the considered views and recommendations of the Administrative Conference of the United States to suggest that precious little time

Thus, in early October 1981, the Department could look forward, if it did not abandon traditional rulemaking proceedings, at a minimum to (1) a barebones period of thirty days for comments to be filed, (2) additional time thereafter as required to consider these comments, and (3) then, if necessary, still more time to redraft the rule in final form. The Department also faced the possibility of further delay as a result of OMB's review of the rule. Finally, the Department would confront the section 553(d) requirement of thirty-days notice before a final rule becomes effective. Even assuming that the Department could have (1) cut the comment period to the bone, (2) expedited its consideration of the comments filed, and (3) invoked the "good cause" exception to section 553(d), we are quite unable to conclude that the Secretary's decision in early October that insufficient time was left to complete standard form rulemaking was unreasonable, or that he failed to support invocation of the "good cause" exception of section 553(b)(B).[19]

Indeed, the Department's early October pessimism about its chances of completing a standard rulemaking proceeding in a timely fashion appears fully borne out by delays the Department encountered in its efforts to promulgate the interim rule. As described in part I, *supra*, the discovery of an error in the draft interim rule delayed completion of work on the draft until December 8, 1981. If the Department, instead of producing an interim rule on this date, had completed work on a draft proposed rule, it is clear beyond peradventure that insufficient time would have existed between December 8, 1981 and the January 1, 1982 implementation deadline—even allowing for a late January final adoption of the rule—for a truncated 30-day comment period and reasoned agency consideration of and reaction to the comments.[20]

Further, the hypothetical proposed rule would, as of December 8, 1981, still have been subject to Departmental and OMB clearance—a process which consumed six weeks in the promulgation of the interim rule. While it may be true that the Department would have been under greater pressure to complete its work had it decided to continue work on a proposed rule, it is highly doubtful in light of what in fact happened that the Department would have been able to complete a proposed rule in sufficient time for a standard rulemaking to be completed.

A secondary mitigating factor here is the paucity of personnel in FNS in relation to the amount of work manifestly required to produce the regulations within this abbreviated time frame. Uncontroverted record evidence establishes that during most of this period FNS had only three full-time staff members assigned to work on· *all* OBRA-mandated changes in CCFP and Summer Food Service Program regulations; of these employees, one worked full-time on the CCFP reimbursement regulation. Braley Declaration ¶ 4. While agency understaffing in a rulemaking process would not, without more, normally constitute grounds for the "good cause" exception, the OBRA-mandated regulatory changes here were sufficiently extensive and burdensome to warrant the District Court's consideration of agency personnel shortages in this case.

2

Our decision with respect to the good cause exception is entirely in keeping with the Third Circuit's recent decision in *Phila-*

for a comment period was available under the circumstances here.

19. We further note that the primacy of the January 1, 1982 implementation deadline compels us to reject appellants' argument that the regulations should be set aside because the Department failed to meet the October 13, 1981 deadline for promulgating the regulations. This view of the matter, if accepted, would utterly frustrate Congress' intent (satisfied by the regulation now in place) to overhaul the system as of January 1, 1982, and would, in effect, create a penalty, which is at complete odds with Congress' mandate, for the Department's failure to promulgate the rules in a timely fashion.

20. The Department's review of the 125 comments submitted after the interim rule was announced appears to have taken approximately 3 months.

*delphia Citizens, supra,* which likewise involved a fast-track OBRA provision. At issue there was a challenge to interim regulations published by the Department of Health & Human Services, pursuant to OBRA, with respect to the Aid to Families with Dependent Children ("AFDC") program. The new AFDC regulations were required by OBRA to be in place by October 1, 1981. This schedule justified, in the Third Circuit's view, invocation of the section 553(b)(B) "good cause" exception. To be sure, an additional three months was available here to FNS to complete its OBRA-mandated rulemaking. Nevertheless, the additional time available in this instance for changing the CCFP reimbursement regulations does not, in view of other exigent demands upon FNS and the time needed to complete a notice-and-comment rulemaking, lead us to an outcome contrary to that reached in *Philadelphia Citizens.*

In so concluding, we are mindful that strict congressionally imposed deadlines, without more, by no means warrant invocation of the good cause exception. Indeed, this court in *State of New Jersey, supra,* rejected agency arguments that a "tight statutory schedule" constitutes "good cause." But it is clear beyond cavil that we are duty bound to analyze the entire set of circumstances before us, just as the court did in *State of New Jersey.* There, unlike here, it was readily available to the agency to publish information (States' proposed classifications of air-quality-control regions as "attainment," "nonattainment," or "unclassifiable" when measured against the Clean Air Act's air quality standards) as a proposed rule and then to receive comments. 626 F.2d at 1042–43.[21] Here, as we have already seen, the Secretary was required, in order to comply with the OBRA mandate, to develop a complex reimbursement formula. That formula was de-

veloped only in connection with the review and evaluation of voluminous data and complex analyses, and after consultation with sponsoring organizations. The complexity of the enterprise is eloquently suggested by the discovery in November 1981 of an error which had infected the draft formula.

Under the entire circumstances before us, we therefore conclude, as did the District Court, that the statutorily provided exception was satisfied in this case.

3

Even were we to conclude that the Secretary did not have good cause to issue the interim rule without notice and comment, we would face hopelessly intractable problems in framing an approrpiate remedy. This unhappy situation is strongly suggested by the very curious posture of appellants' good cause arguments, once their other APA arguments, discussed above, are rejected as without merit. Appellants' across-the-board attack on the final rule constituted the only articulated theory of their case. Once the final rule is affirmed, any relief for the Department's invocation of the good cause exception as to the interim rule would become quite difficult, if not impossible, to frame.

First, the Department's treatment of post-promulation comments offered in this proceeding "suggests that the agency has been open-minded," with the result that "real 'public reconsideration of the issued rule' has taken place." *Levesque v. Block,* 723 F.2d 175, 188 (1st Cir.1983). Thus, any presumption against a "late" comment period following adoption of an interim rule has been overcome in this case, with the result that remand to the agency for further proceedings would not in any event be necessary. *Id.* at 187–89.

---

21. The other decision of this court holding that an agency failed to meet the good cause exception is *National Association of Farmworkers Organizations v. Marshall,* 628 F.2d 604 (D.C.Cir. 1980). In that case, the Secretary of Labor had promulgated immediately effective final rules, without public notice and comment, approving pesticides for use in areas where ten and eleven-

year old children were employed as agricultural workers.

In marked contrast to the factual setting of the instant case, no statutory deadlines were at work in *Marshall.* Instead, the Secretary improperly invoked the exigent circumstances of an impending harvest season to justify his precipitous actions. *Id.* at 621.

Second, OBRA's clear mandate that reductions in administrative reimbursements commence on January 1, 1982, presents a formidable barrier to any remedy which would reinstate the pre-OBRA regulation for the period covered by the interim rule or which would otherwise increase the funding available to sponsoring organizations above the level established by OBRA. The facts of this case differ significantly from *Levesque v. Block, supra,* in which the First Circuit ordered retroactive payments of Food Stamp Program benefits improperly reduced by an interim rule. In *Levesque,* the relevant section of OBRA did not establish any deadlines for implementation, leaving that determination to the discretion of the Secretary of Agriculture. Further, the First Circuit determined that a relevant section of "OBRA II," the Omnibus Budget Reconciliation Act of 1982,[22] was not self-executing. In contrast, the two OBRA I sections relevant to the case at hand, when read together, fit squarely within the category of statutes made self-executing by inclusion of an effective date. *Levesque, supra,* 723 F.2d at 186–87.[23] Therefore, Congress' clearly expressed intention that reimbursement reductions were to commence as of January 1, 1982, must be given effect.[24]

Appellants seemed to concede this point below, stating that they

do not disagree with [appellees'] contention [that] Congress did not intend the payment of federal grant monies contrary to [the] federal statute. What [appellants] are challenging is the [appellees'] use of data that is inaccurate and inadequate to calculate reductions ... thereby resulting in *savings in excess of the amount authorized by statute.*[25]

The District Court concluded from this statement that appellants "only ask that funds be reallocated and ... do not seek expenditures in excess of the statutory maximum." Memorandum Opinion at 4. Appellants have not, however, suggested either below or in this court either a legal rationale to justify or a practical formula to effect such a "reallocation." Indeed, any such reallocation would have to be undertaken pursuant to yet another reimbursement formula, different from the one now in place, but which would also generate the specific cost reductions mandated by OBRA.[26]

---

22. Pub.L. No. 97–253, § 192(a), 96 Stat. 763, 788 (1982).

23. Although it could be argued that OBRA's effective date as to the CCFP amendments was "made subject to implementing regulations," *Levesque,* 723 F.2d at 186, the fact that OBRA also provided for adoption of those regulations prior to its effective date, *see* OBRA § 820(c), compels the conclusion that OBRA's CCFP amendments were "self-executing" within the meaning of *Levesque.*

24. The facts of *Buschmann v. Schweiker,* 676 F.2d 352 (9th Cir.1982), another decision invalidating an interim rule and ordering payment of federal benefits improperly withheld, also differ substantially from the instant case. Most importantly, the underlying statute there did not, as here, establish an implementation deadline. We further note that the *Buschmann* court failed to explain whether the underlying statute directed the adoption of a benefit formula different from the old formula reinstated by the court for the interim period. To the extent that the Ninth Circuit's opinion may be interpreted as ordering a payment of benefits contrary to the provisions of the underlying statute, we would respectfully be strongly disinclined to follow that rather provocative path.

25. Plaintiffs' Response in Opposition to Defendants' Motion for Summary Judgment at 11 (emphasis added).

26. Moreover, if we assume, as seems likely, that all Fiscal Year 1982 funds allocated for CCFP administrative reimbursements have been distributed to the States and sponsoring organizations, and have been spent, any reallocation of those funds would be, to say the least, highly problematic. *See Ambach v. Bell,* 686 F.2d 974, 986 (D.C.Cir.1982) (holding in the context of a motion for preliminary injunction that once federal funds are "distributed to the States and obligated, they cannot be recouped," and that "it [would] be impossible ... to award the plaintiffs the relief they request if they should eventually prevail on the merits"); *West Virginia Association of Community Health Centers, Inc. v. Heckler,* 734 F.2d 1570, 1576–1577 (D.C.Cir. 1984) (discussing cases in which recoupment is possible).

Such an exercise would be quite difficult. It would as well, to put it mildly, be disruptive to the orderly administration of CCFP. Braley Declaration ¶¶ 28–31. More fundamentally, it would be futile: in light of our conclusion that the final rule, as adopted, is neither arbitrary nor capricious, the interim rule, which was *identical* to the final rule, was *a fortiori* similarly invulnerable to a frontal attack against its substantive provisions. Moreover, we cannot ignore the telling fact that the regulation has indeed been effective in securing the expenditure reductions ordered by Congress. *See* note 14, *supra.*

Thus, even were we to hold, as appellants invite us to do, that the Secretary improperly invoked the good cause exception, we would find ourselves quite unable to fashion a remedy for enforcement of this rule during the now long-gone interim period. Affirmance of the District Court on this independent ground would be entirely in keeping with the Supreme Court's admonition that a federal court exercising its equitable powers in reviewing agency action "must act within the bounds of the statute and without intruding upon the administrative province, [and] may adjust its relief to the exigencies of the case ...." *Ford Motor Co. v. NLRB*, 305 U.S. 364, 373, 59 S.Ct. 301, 307, 83 L.Ed. 221 (1939). *Accord, Indiana & Michigan Elec. Co. v. FPC*, 502 F.2d 336, 346 (D.C.Cir.1974), *cert. denied*, 420 U.S. 946, 95 S.Ct. 1326, 43 L.Ed.2d 424 (1975).

### III

The judgment of the District Court is therefore

*Affirmed.*