134 F.3d 393
 328 U.S.App.D.C. 237
 ASIANA AIRLINES, et al., Petitioners,
v.
FEDERAL AVIATION ADMINISTRATION and Barry Valentine, Acting
Administrator, Federal Aviation Administration, Respondents,
Air New Zealand Limited, Intervenor.
 Nos. 97-1356, 97-1357, 97-1358, 97-1359, 97-1360, 97-1362,
97-1363, & 97-1364.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Nov. 21, 1997.
Decided Jan. 30, 1998.
 
 On Petitions for Review of an Order of the Federal Aviation Administration.
 Robert W. Kneisley, Dallas, TX, argued the cause for petitioners, with whom Geoffrey P. Gitner, M. Roy Goldberg, Frederick S. Hird, Jr., Joseph E. Schmitz, Washington, DC, David W. Miller, Moffett B. Roller, Don H. Hainbach, Washington, DC, Paul V. Mifsud, Carl W. Vogt, Washington, DC, Frederick Robinson and James S. Campbell were on the briefs. Jeffrey N. Shane, Washington, DC, entered an appearance.
 Peter R. Maier, Attorney, United States Department of Justice, argued the cause for respondents, with whom Frank W. Hunger, Assistant Attorney General, Mary Lou Leary, United States Attorney, Washington, DC, and Robert S. Greenspan, Attorney, United States Department of Justice, were on the brief.
 Before: WALD, SENTELLE and HENDERSON, Circuit Judges.
 Opinion for the court filed by Circuit Judge SENTELLE.
 SENTELLE, Circuit Judge:
 
 
 1
 Petitioners challenge an FAA Interim Final Rule imposing annual fees totaling nearly $100 million on flights that neither take off from nor land in the United States. We reject their claims that the FAA acted unlawfully in employing an expedited procedure which precluded a round of notice and comment before the effective date of the Rule, and that the regulation violated the antidiscrimination provisions of various international aviation agreements. However, the FAA's allocation of fixed and common costs using a value-oriented "Ramsey pricing" methodology did violate the statutory directive that the fees for overflights be directly related to the agency's cost of providing services. We therefore vacate the Interim Final Rule and remand for further proceedings.
 
 
 2
 * Section 273 of the Federal Aviation Reauthorization Act, 49 U.S.C. § 45301 (the "Act"), enacted October 9, 1996, directs the Federal Aviation Administration ("FAA") to establish a fee schedule and collection process to cover "[a]ir traffic control and related services provided to aircraft other than military and civilian aircraft of the United States government or of a foreign government that neither take off from, nor land in, the United States." 49 U.S.C. § 45301(a)(1). The statute directs the FAA to "ensure that each of the [required] fees ... is directly related to the Administration's costs of providing the service rendered," and states that covered services "include the costs of air traffic control, navigation, weather services, training and emergency services which are available to facilitate safe transportation over the United States, and other services provided by the Administrator or by programs financed by the Administrator to flights that neither take off nor land in the United States." 49 U.S.C. § 45301(b)(1)(B). The statute authorizes the FAA "to recover in fiscal year 1997 $100,000,000," 49 U.S.C. § 45301(b)(1)(A). Finally, the statute directs that a special procedure shall apply: the FAA "shall publish in the Federal Register an initial fee schedule and associated collection process as an interim final rule, pursuant to which public comment will be sought and a final rule issued." 49 U.S.C. § 45301(b)(2).
 
 
 3
 Acting upon this apparent message to take prompt regulatory action, the FAA issued an Interim Final Rule ("IFR") establishing a fee schedule and collection process, with an effective date of May 19, 1997. 62 Fed.Reg. 13496 (March 20, 1997). The IFR provided that the FAA would accept comments until July 18, 1997, after which the FAA would develop a final rule.
 
 
 4
 The IFR established fees structured as follows. Based upon an "Analysis of Overflights: Costs and Pricing" by private consultant GRA, Inc. (the "GRA Study"), the FAA noted that its services provided to overflights required both incremental expenditures, increasing with the quantity of services provided, and fixed and common expenditures for facilities and other expenses that could not be attributed to particular flights or classes of flights. The GRA Study allocated fixed costs among all classes of users using a methodology called "Ramsey pricing." This methodology distributes fixed costs among classes of users based on the elasticity of their demand for services in an effort to minimize the effect of the regulation on the behavior of users. Thus, under this method of allocating fixed costs, classes of users less sensitive to changes in price are allocated a relatively greater share of fixed and common costs. See M. Wohl & C. Hendrickson, TRANSPORTATION INVESTMENT AND PRICING PRINCIPLES 208-09 (John Wiley & Sons 1984).
 
 
 5
 The petitioners, including several foreign airlines and an association of Canadian airlines, ask us to vacate the IFR for a variety of reasons. First, they assert that, despite the procedures specified in 49 U.S.C. § 45301(b)(2), the FAA violated both the Administrative Procedure Act ("APA"), 5 U.S.C. § 553, and the consultation provisions of several international aviation agreements, by making the new fee structure effective before considering their comments and objections. They also contend that the IFR violated the antidiscrimination provisions of international agreements by imposing fees on overflights which had a disparate impact on foreign airlines. Finally, they argue that the IFR's allocation of fixed and common costs using Ramsey pricing violated the statutory requirement that "each of the fees ... [be] directly related to the Administration's costs of providing the service rendered." 49 U.S.C. § 45301(b)(1)(B).
 
 II
 
 6
 The petitioners first argue that the FAA unlawfully imposed the fees set forth in the IFR before allowing opportunity for affected parties to comment or consult. They base this claim on the notice and comment requirements of the APA, as well as the provisions of several international aviation agreements.
 
 
 7
 * Section 553 of the APA requires agencies to publish "[g]eneral notice of proposed rule making," and "give interested persons an opportunity to participate in the rule making...." 5 U.S.C. § 553(b)-(c). Such rule-making proceedings must provide both notice and meaningful opportunity to comment. See Home Box Office, Inc. v. FCC, 567 F.2d 9, 35-36 (D.C.Cir.1977) ("[T]he opportunity to comment is meaningless unless the agency responds to significant points raised by the public."). Section 553 provides that an agency may depart from normal notice and comment procedures for "good cause." 5 U.S.C. § 553(b)(B). The APA also recognizes that Congress may modify these requirements, but provides that a "[s]ubsequent statute may not be held to supersede or modify this subchapter ... except to the extent that it does so expressly." 5 U.S.C. § 559.
 
 
 8
 In this case, the FAA acknowledged that it issued the IFR "without public notice and comment" as ordinarily required by § 553, and did not properly invoke the "good cause" exception to normal APA procedures. 62 Fed.Reg. at 13502. Instead, the IFR expressly relied on a procedural directive contained within the Act as "subsequent and specific authority" that trumped the otherwise-applicable APA § 553. Id. Within a section of the Act entitled "Limitations," Congress instructed the FAA to "publish in the Federal Register an initial fee schedule and associated collection process as an interim final rule, pursuant to which public comment will be sought and a final rule issued." 49 U.S.C. § 45301(b)(2). Keeping in mind Congress's goal to begin fee collection as soon as possible, the FAA interpreted the directive to proceed via "interim final rule" as obviating the usual first step of providing notice of a proposed rule.
 
 
 9
 We have looked askance at agencies' attempts to avoid the standard notice and comment procedures, holding that exceptions under § 553 must be "narrowly construed and only reluctantly countenanced" in order to assure that "an agency's decisions will be informed and responsive." New Jersey v. EPA, 626 F.2d 1038, 1045 (D.C.Cir.1980). For example, in New Jersey, the EPA issued an immediately effective final rule with no prior notice or solicitation of comments, believing that the schedule for promulgation of the rule made it impracticable to engage in the notice and comment process. Id. at 1041. We held that the "tight statutory schedule" set forth in the Clean Air Act for designation of "attainment" and "nonattainment" areas did not, without more, justify departure from ordinary APA procedures, because "under the facts of this case, the Administrator could have reconciled the commands of the two acts by publishing the designations ... as proposed rules." Id. at 1047. Similarly, in Air Transport Ass'n of Am. v. Department of Transportation, 900 F.2d 369 (D.C.Cir.1990), vacated for mootness, 933 F.2d 1043 (D.C.Cir.1991), we characterized New Jersey as holding that a "statutory deadline did not constitute good cause to forgo notice and comment absent 'any express indication' by Congress to this effect." Id. at 378-79 (quoting New Jersey, 626 F.2d at 1043). Cf. Petry v. Block, 737 F.2d 1193, 1200-02 (D.C.Cir.1984) (holding that "extraordinary factors" justified invocation of the good cause exception under § 553). However, none of those decisions involved statutory language similar enough to that in this case as to create precedent binding our construction, as none presented a specific directive to adopt procedures other than those of the APA.
 
 
 10
 Applying § 559, the Supreme Court has held that "[e]xemptions from the terms of the Administrative Procedure Act are not lightly to be presumed in view of the statement in [§ 559] that modifications must be express." Marcello v. Bonds, 349 U.S. 302, 310, 75 S.Ct. 757, 761-62, 99 L.Ed. 1107 (1955) (citation omitted). Marcello relied upon statutory language and legislative history to hold that the 1952 Immigration and Nationality Act displaced the hearing requirements of the APA. Id.; see also Ardestani v. INS, 502 U.S. 129, 134, 112 S.Ct. 515, 519, 116 L.Ed.2d 496 (1991) (reaffirming Marcello, holding that the APA does not "displace the INA in the event that the regulations governing immigration proceedings become functionally equivalent to the procedures mandated for adjudications governed by [APA] § 554."). And, as we have previously stated, "the import of the § 559 instruction is that Congress's intent to make a substantive change be clear." Ass'n of Data Processing Serv. Orgs., Inc. v. Board of Governors, 745 F.2d 677, 686 (D.C.Cir.1984) (emphasis in original). The question here is whether Congress has established procedures so clearly different from those required by the APA that it must have intended to displace the norm.
 
 
 11
 Our closest precedent is Methodist Hospital of Sacramento v. Shalala, 38 F.3d 1225 (D.C.Cir.1994). There, a statute directing the Secretary of Health and Human Services to establish new Medicare regulations expressly provided for an "expedited regulatory process":
 
 
 12
 The Secretary shall cause to be published in the Federal Register a notice of the interim final ... rates ... no later than September 1, 1983, and allow for a period of public comment thereon. Payment on the basis of prospective rates shall become effective on October 1, 1983, without the necessity for consideration of comments received, but the Secretary shall, by notice published in the Federal Register, affirm or modify the amounts by December 31, 1983, after considering those comments.
 
 
 13
 Social Security Amendments of 1983 ("Amendments"), 97 Stat. 65, 168 (April 20, 1983). The Secretary claimed that this specific required procedure displaced APA requirements, arguing in the alternative that the "good cause" exception made notice and comment unnecessary if the APA applied. Methodist Hospital, 38 F.3d at 1235.
 
 
 14
 We held for the Secretary but did not clearly differentiate between the two arguments. Citing Petry, we noted that the Secretary confronted a statute different from those which allowed the agency "a substantial period of time within which to propose regulations, the promulgation of which it knew was both necessary and forthcoming in the future." Id. at 1237 (citations and quotation marks omitted). We concluded that "the strict deadlines and special procedures imposed" on the Secretary by the amended act under which she was operating "constituted sufficiently 'good cause' ... for bypassing the APA's notice and comment requirement." Id. (quoting 5 U.S.C. § 553(b)(B)). Methodist Hospital clearly did not disavow reliance on the good cause exception found in § 553. We think that it could have. Statutory language imposing strict deadlines, standing alone, does not constitute sufficient good cause under § 553 or an express modification pursuant to § 559 justifying departure from standard notice and comment. But, as we said in Methodist Hospital, when Congress sets forth specific procedures that "express[ ] its clear intent that APA notice and comment procedures need not be followed," an agency may lawfully depart from the normally obligatory procedures of the APA. Id.
 
 
 15
 In the Act, Congress provided express direction to the FAA regarding its procedure for establishing fees for overflights: "the Administrator shall publish in the Federal Register an initial fee schedule and associated collection process as an interim final rule, pursuant to which public comment will be sought and a final rule issued." 49 U.S.C. § 45301(b)(2). This language at least in part specifies procedures which differ from those of the APA: the agency was to issue not a proposed rule, but an "interim final rule," and comment was to be sought "pursuant to," not in anticipation of, that rule. The Act also authorized the Administrator "to recover in fiscal year 1997 $100,000,000." 49 U.S.C. § 45301(b)(1)(A). This language, along with the statutory directive that the IFR specify procedures for collecting fees, demonstrates that the statute contemplated that the IFR would be issued and implemented during fiscal 1997. Given that the Act was not passed until after the beginning of fiscal 1997, the agency had to move quickly to establish a fee schedule and collection process in order to fulfill this statutory goal. The legislative history of the Act also demonstrates that Congress sought rapid action from the agency to begin recovering costs of services provided to overflights through FAA-controlled airspace which heretofore had been "free riders." See, e.g., Report of the Committee on Commerce, Science, and Transportation on S.1994, S.Rep. No. 104-333, at 37 (1996) ("It is envisioned that the FAA will move as quickly as possible to develop and impose these fees and systems. The sooner funds can be drawn from the proposed fees on international overflights ... the better off the FAA will be in the short-term.").
 
 
 16
 In this statutory scheme, Congress specified procedures under § 45301(b)(2) that cannot be reconciled with the notice and comment requirements of § 553. A cardinal principle of interpretation requires us to construe a statute "so that no provision is rendered inoperative or superfluous, void or insignificant." C.F. Communications Corp. v. FCC, 128 F.3d 735, 739 (D.C.Cir.1997) (internal quotation marks omitted) (quoting Mail Order Ass'n of America v. United States Postal Service, 986 F.2d 509, 515 (D.C.Cir.1993)). The petitioners have not advanced any reasonable construction of § 45301(b)(2) that would harmonize with simultaneous application of § 553. Were we to hold that the FAA had to issue a proposed rule and allow meaningful opportunity to comment before issuing the IFR, the resulting process would be so nearly indistinguishable from normal notice and comment as to deprive this special procedural provision of any effect, and to thwart the apparent intent of Congress in enacting the special procedure. It is therefore not difficult to conclude that Congress in this case purposely and expressly created an exception to the otherwise-applicable APA notice and comment procedures.
 
 
 17
 Admittedly, Congress did not speak as clearly here as it had in Methodist Hospital. There, the Amendments not only specified proceeding by means of an interim final rule, but also established a timetable for the IFR, including the effective date of new rates and a target date for the final rule. Furthermore, the Amendments specifically noted that the rates "shall become effective ... without the necessity for consideration of comments received." Amendments, supra. Even though § 45301(b)(2) does not establish a specific timetable for every step in the regulatory process, it plainly expresses a congressional intent to depart from normal APA procedures. The FAA followed that congressional intent as far as it went. It is probably the case that once the FAA issued the IFR, the APA once again became controlling for all subsequent proceedings, but that is not the question before us. For present purposes, given the "entire set of circumstances before us," Petry, 737 F.2d at 1203, the FAA has conformed to applicable law.
 
 
 18
 To summarize, we hold that, to the extent that § 45301 specified otherwise, the FAA was not required to conform to APA § 553 procedures. Because the FAA complied with § 45301, the process by which it implemented fees for overflights withstands the petitioners' challenge.
 
 B
 
 19
 The petitioners also argue that international aviation agreements create a duty to provide "[r]easonable notice ... prior to changes in user charges," to engage in "consultations," and to "exchange such information as may be necessary to permit an accurate review of the reasonableness" of charges. See, e.g., U.S.-Canada Air Transport Agreement, § 8(C). Because the FAA must "act consistently with obligations of the United States government under an international agreement," 49 U.S.C. § 40105, the petitioners claim that the FAA unlawfully failed to receive and respond to comments before the new fee structure went into effect. The FAA responds that none of these agreements creates an enforceable duty to provide notice or consultation, and if they did, any obligation under § 40105 to comply with these agreements is superseded by its more recently enacted and more specific duty to comply with § 45301 in implementing fees for overflights.
 
 
 20
 We agree with the FAA that its actions did not violate any duties actually imposed by international aviation agreements. Most of the agreements relied upon by petitioners speak of general aims, not specific obligations. For example, the U.S.Canada Air Transport Agreement imposes no duty to consult prior to changes in user fees. It provides only that "[e]ach Party shall encourage consultations between the competent charging authorities ... and the airlines ... and shall encourage the competent charging authorities ... to exchange such information as may be necessary to permit an accurate review of the reasonableness of the charges...." U.S.Canada Air Transport Agreement, § 8(C) (emphasis added). The strongest language petitioners advance, found in the same agreement, says no more than that "[r]easonable notice shall be given prior to changes in user charges." Id. In this case, the FAA published the new fee structure sixty days before its effective date. The new regulation was not sprung upon any user without that user having advance knowledge that its activities would incur these new fees. Petitioners offer us no basis to conclude that this is not reasonable notice.
 
 
 21
 The petitioners have not cited any international agreement that comes close to imposing a duty to consult. But even if such a duty could be found in an agreement only to "encourage consultations," the record does not indicate that the FAA failed to consult with affected foreign users. Prior to the effective date of the IFR, FAA staff held informal meetings as well as a public meeting with representatives of foreign airlines, provided copies of materials from the docket relevant to the IFR's development, and accepted forty comments on the rule. Although these exchanges may not have influenced the content of the regulations made effective on May 19, 1997, the terms "consultation" and "exchange of information" in the cited international agreements do not import the full notice and comment apparatus of APA § 553. The procedures adopted by the FAA cannot be said to have breached the terms of these international agreements.
 
 III
 
 22
 Substantively, petitioners argue that the rule adopted by the FAA unlawfully discriminates against foreign air carriers in violation of the provisions of several international aviation agreements. On this point petitioners' quarrel is with Congress, not the FAA. The agency did nothing more than implement the express terms of the statutory mandate. But we need not linger long over the issue. The regulation does not discriminate against foreign carriers by applying fees to overflights. The Act directs the agency to develop a fee structure for services provided to aircraft that "neither take off from, nor land in, the United States." 49 U.S.C. § 45301(a)(1). On its face, this language is completely neutral, applying to all overflights regardless of nationality. In fact, several U.S. carriers have already been charged fees for services provided to overflights.
 
 
 23
 Of course, a facially neutral statute may be no more than a pretext to mask discriminatory intent and effects--but we find no pretext in this case. The United States has for many years expended tax dollars to provide air traffic control and other services to aircraft flying through its airspace. Before this enactment, the FAA collected user fees to support its operations via taxes imposed on carriers only at takeoff and landing, and further subsidized overflight services from its general operating budget. Thus, any flight which originated or terminated in U.S. territory not only paid for its share of services, but to some degree cross-subsidized the provision of services to flights which used U.S. services without touching the ground in the U.S. Flights crossing through U.S. airspace require facilities and staff to manage them. Heretofore, these flights have not borne their share of the costs of services provided to them by the FAA. It is not discriminatory to impose fees on this group of users for services that they use but for which they have not previously been charged, regardless of whether the group is disproportionately composed of foreign carriers.
 
 IV
 
 24
 Petitioners argue that the FAA exceeded the scope of its statutory authorization by establishing fees for providing inflight services to aircraft crossing oceanic territory served by the FAA. They base this argument on a single phrase embedded within the statute's limitations clause, namely, that "services" only include those "which are available to facilitate safe transportation over the United States." 49 U.S.C. § 45301(b)(1)(B). The petitioners assert that a "plain meaning construction" of the term "over the United States" places a geographic limitation on the FAA's authority to impose overflight fees. They say this constitutes a clear statement by Congress addressing "the precise question at issue," Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984), and conclude that the portion of the regulation addressing oceanic overflights is ultra vires.
 
 
 25
 Reading this phrase in its context demonstrates the weakness of this argument. The limitations clause defines "services" to include
 
 
 26
 the costs of air traffic control, navigation, weather services, training and emergency services which are available to facilitate safe transportation over the United States, and other services provided by the Administrator or by programs financed by the Administrator to flights that neither take off nor land in the United States.
 
 
 27
 49 U.S.C. § 45301(b)(1)(B). Under the most natural reading of the statutory language, the phrase "which are available to facilitate safe transportation over the United States" modifies "training and emergency services," not the entire range of possible services. At most, the phrase modifies the list of items beginning with "air traffic control," and concluding with "training and emergency services." In no way can it sensibly be construed to modify "costs," the object of the verb "include" which is modified by the whole prepositional phrase beginning with "of" and including the words "and other services provided by the Administrator." That last item in the list, "other services provided by the Administrator," plainly expresses a congressional intent to include in the relevant "costs" services outside those set forth in the earlier list, no matter how many of the listed nouns are modified by the phrase including the critical term "over the United States."
 
 
 28
 Therefore, not only does the section not express a clear congressional intent to prevent the FAA from imposing fees for oceanic overflights, but the natural reading of the statutory language is that Congress has expressed its intent that the agency recover its costs for services provided to flights through U.S.-controlled airspace without regard to whether an aircraft crosses U.S. land territory. Under Chevron, this is enough; we need not address whether the FAA reasonably could construe the statute to allow it not to impose fees on such flights. Insofar as there is any ambiguity in Congress's intent on the question, we can only require that an agency's interpretation be a reasonable one. Chevron, supra. The statute can at least reasonably be interpreted to allow the FAA to charge for services provided to an aircraft that neither takes off nor lands in the United States, regardless of whether its flight path takes it "over the United States."
 
 V
 
 29
 Finally, petitioners argue that the FAA exceeded its statutory authority by basing fees, at least in part, on the value to the recipient of services provided instead of on costs. Petitioners contend that the statutory directive to "ensure that each of the fees required ... is directly related to the Administration's costs of providing the service rendered," 49 U.S.C. § 45301(b)(1)(B), prohibits such value-based pricing. The FAA does not dispute petitioners' interpretation of the statute. The FAA Office of Aviation Policy and Plans expressly recognizes that "Congress has mandated the fee should be service based and not based on value...." Regulatory Evaluation at 7. The IFR itself states that one option proposed by the GRA Study, charging based on aircraft weight, would violate this limitation: "when viewed as a measure of value of the service to the user [the use of weight] is not consistent with the FAA's current authority." 62 Fed.Reg. at 13501. We agree with petitioners that, insofar as the FAA allocated fixed and common costs using the Ramsey pricing methodology, its fee structure impermissibly included a component based on value to the user.
 
 
 30
 The FAA estimated the total annual cost of air traffic control and related services to be $6.3 billion, including $2.2 billion in incremental costs directly attributable to provision of in-flight services to all flights.[1] See FY 1995 Cost Allocation Study at 6-12, 6-19, & 6-22. Incremental costs vary with the quantity of service provided and include, for example, controller staff time and facility operating costs. Petitioners do not contest that a component of fees based on these costs is indeed "directly related to the Administration's costs of providing the service rendered" to each flight. The remaining $4.1 billion reflects the fixed and common costs of providing air traffic services, including, for example, radar installations and computer software. The FAA asserts that "excluding such costs from the rate base for overflights would effectively perpetuate a system in which operators of such flights do not fully reimburse the agency for the services they receive," and that "the exclusion of these costs from the rate base would conflict with Congress's directive that 'the fees shall be based on the direct total cost of providing the service.' " FAA Br. at 22 (quoting H.R. Conf. Rep. No. 104-848, 104th Cong., 2d Sess. 110, reprinted in 1996 U.S.C.C.A.N. 3703, 3732). Petitioners do not dispute that the agency may recover fixed costs; they simply argue that the FAA did not "allocat[e] its indirect costs in a way that ... met statutory standards." Pet. Repl. Br. at 14. The difficulty with determining the portion of fixed and common costs attributable to overflights is that by definition these costs are shared among a great number of users besides overflights and so, in a sense, do not directly relate to the quantity of services consumed. Thus, a method must be devised to apportion these costs among all the users who benefit from them, without violating the strictures of the statute.
 
 
 31
 The apportionment methodology adopted by the FAA involved an optimization technique called "Ramsey pricing." Ramsey pricing varies the share of total fixed and common costs allocated to a user based on the likely impact of such a cost change on that user's behavior. This impact is related to the user's elasticity of demand and to the relationship between the amount to be charged and the user's total operating costs.
 
 
 32
 In applying that method to allocate fixed costs, the GRA Study classified flights into "User Types," including Commercial Users, General Aviation Users, Public Users, and Overflights, with the first three further broken down into twelve subtypes. Each of these thirteen categories was assigned a demand elasticity based on a rough estimate from earlier studies. The GRA Study categorized 1995 flight data by User Type and divided them into seven flight distance categories. GRA then computed the average operating cost (including crew, oil, fuel, maintenance, and taxes) and the average incremental air traffic services cost for each of the 61[2] Type-Distance combinations. Using a "mathematical optimization technique," it finally determined the Ramsey prices for each combination. While its description of this process is, charitably speaking, rather opaque, it appears that this involved finding the optimum total cost (including operating costs and incremental and fixed air traffic services costs) for each combination based on the demand elasticity and the difference between price and incremental cost. Subtracting out the operating costs yielded the "Ramsey price" for each category, including both incremental and fixed costs. Significantly, the study noted that "[t]he allocation of those common and fixed costs depends heavily on the overall flight cost. As the price of air traffic services becomes a smaller fraction of total costs, the optimization will assign a higher Ramsey price to higher cost flights (holding all else constant)." GRA Study at 51. Finally, the Ramsey prices for the overflight categories were adjusted for services not provided to oceanic overflights and for inflation and cost increases since 1995, and run through a regression to arrive at the per-mile cost equations found in the IFR.
 
 
 33
 The FAA offered good reasons for adopting this approach. Ramsey pricing "varies the shares of common or fixed costs allocated to a user type based on the likely impact of such a cost change on user behavior." GRA Study at 38. It results in pricing which theoretically ensures the most economically efficient use of services. (The most efficient price structure, in terms of forcing users to internalize the costs of their operations, is to set fees equal to marginal costs. Ramsey pricing aims to preserve incentive neutrality when adding a fixed cost component to marginal-cost prices.) Ramsey pricing could also have a positive impact on the FAA's primary mission of air traffic safety: some cost-sensitive users, if charged a large share of fixed costs, might in response lower their utilization of air traffic services to an unsafe level.
 
 
 34
 The difficulty with the FAA's justification is that not all good reasons are lawful reasons. See, e.g., American Petroleum Inst. v. EPA, 52 F.3d 1113, 1119 (D.C.Cir.1995) (An agency "cannot rely on its general authority to make rules necessary to carry out its functions when a specific statutory directive defines [its] relevant functions ... in a particular area."). No matter how strong the justification, § 45301 prohibits basing fees on the value of the service to the user rather than cost. And Ramsey pricing appears to do just that. As described by the FAA, Ramsey pricing "takes a cost amount from another source and allocates that cost among particular users based on the value of the service to them." FAA Br. at 21; see also id. at 5 ("Ramsey Pricing methodology takes a given cost amount and allocates it among particular users based on the value of the service to them."). In its brief, the FAA insists that the petitioners wrongly suggest that it used Ramsey pricing to "establish costs based on the value of such costs to users." Id. at 21 (emphasis added). This distinction drawn by the FAA illuminates the very pit into which it has fallen: although it is true that the total cost figure is based on real cost data and not on a "market price" for services, the fact is that the FAA has distributed those costs among all users of the system based on the value of services as perceived by each group of users. The problem arises because the FAA chooses to understand "costs" at too high a level of generality. The FAA seems to think it has complied with Congress's mandate simply because "[t]otal fees assessed for using each type of airspace (domestic and oceanic) do not exceed the costs of providing services within that type of airspace." 62 Fed.Reg. 13499. But that is not what Congress mandated.
 
 
 35
 Statutory language requiring that "each" fee be "directly related to ... the costs of providing the service rendered" expresses a clear congressional intent that fees must be established in such a way that each flight pays according to the burden associated with servicing that flight. There may be methods to reasonably determine an appropriate fraction of the FAA's fixed costs to assign to each overflight, and if the FAA does not have enough information to precisely determine the burdens imposed by individual flights, it may proceed based on the best data available. See Radio Ass'n on Defending Airwave Rights, Inc. v. Department of Transportation, 47 F.3d 794, 806 (6th Cir.), cert. denied, 516 U.S. 811, 116 S.Ct. 59, 133 L.Ed.2d 22 (1995). However, it may not set fees on a basis other than cost. In this case it attempted to do so when it apportioned its costs among user groups based on each group's relative sensitivity to the amount charged. This regulation cannot be saved by the fact that the total amount recovered would equal the FAA's total cost of providing services, when the fees charged a flight are not "directly related" to the agency's cost of providing "each service."
 
 CONCLUSION
 
 36
 Although the FAA adopted procedures consistent with the statutory requirements, we hold that the fee structure imposed by the IFR was impermissibly based, at least in part, on the value of services to users. Because the IFR and the underlying record material suggest no way to circumscribe a component of the fees based entirely on direct costs of services, we vacate the fee schedule in its entirety and remand to the FAA for further proceedings consistent with this opinion.
 
 
 
 [1]
 Overflights accounted for approximately one percent of these totals
 
 
 [2]
 Matching the twelve subtypes and Overflights against the seven distance categories yielded 91 combinations, but 30 of these had an insignificant number of flights and so were included in the next higher distance block